IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

BEN F. COOPER,                    )
                                  )
            Plaintiff,            )
                                  )
      v.                          )      Case No.
                                  )      05-3246-CV-S-REL-SSA
JO ANNE BARNHART, Commissioner    )
of Social Security,               )
                                  )
            Defendant.            )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Ben Cooper seeks review of the final decision
of the Commissioner of Social Security denying plaintiff's
application for a period of disability and disability
insurance benefits under Titles II and XVI of the Social
Security Act ("the Act").  Plaintiff argues that the ALJ
erred (1) in not giving controlling weight to the opinions
of plaintiff's treating physicians, Dr. Michael Ball and Dr.
Thomas Zurkowski; and (2) ignoring testimony of the
vocational expert.  I find that the ALJ properly discounted
the opinions of Dr. Ball and Dr. Zurkowski, and that the
substantial evidence in the record as a whole supports the
ALJ's determination that plaintiff is not disabled.
Therefore, plaintiff's motion for summary judgment will be
denied and the decision of the Commissioner will be
affirmed.

## I. BACKGROUND

On October 1, 2002, plaintiff applied for a period of disability and disability insurance benefits alleging that he had been disabled since July 12, 2001. Plaintiff's disability stems from back and left hip pain, dizziness, numbness in his hands and feet, stomach aches, depression, shortness of breath, and fatigue (Tr. at 36). Plaintiff's application was denied on March 26, 2003. On June 4, 2004, a hearing was held before an Administrative Law Judge. On November 23, 2004, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On May 11, 2005, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997);

2

<u>Andler v. Chater</u>, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing <u>Steadman v. Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." <u>Id</u>.; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

3

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

4

1. Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert George Horne, in addition to documentary evidence admitted at the hearing.

## A. EARNINGS RECORD

The record shows that plaintiff earned the following income from 1968 through 2000:

| Year | Earnings | Indexed Earnings |
|------|----------|------------------|
| 1968 | $ 362.76 | $ 1,983.80 |
| 1969 | 1,039.23 | 5,372.66 |
| 1970 | 2,293.60 | 11,296.95 |
| 1971 | 2,649.35 | 12,424.85 |
| 1972 | 7,927.33 | 33,859.16 |
| 1973 | 7,233.39 | 29,075.93 |
| 1974 | 7,899.48 | 29,971.75 |
| 1975 | 6,189.96 | 21,852.49 |
| 1976 | 7,066.59 | 23,336.95 |
| 1977 | 14,659.08 | 45,673.35 |
| 1978 | 9,913.51 | 28,615.21 |
| 1979 | 7,119.35 | 18,896.83 |
| 1980 | 3,845.92 | 9,364.68 |
| 1981 | 9,120.76 | 20,177.60 |
| 1982 | 7,158.50 | 15,010.20 |
| 1983 | 11,427.12 | 22,847.76 |
| 1984 | 6,336.17 | 11,965.37 |
| 1985 | 1,842.50 | 3,337.24 |
| 1986 | 1,131.34 | 1,990.08 |
| 1987 | 1,085.15 | 1,794.39 |
| 1988 | 1,555.63 | 2,451.62 |
| 1989 | 11,752.61 | 17,816.33 |

Case 6:05-cv-03246-REL   Document 15   Filed 04/11/06   Page 6 of 64

| | | |
|---|---|---|
| 1990 | 5,131.50 | 7,435.62 |
| 1991 | 971.38 | 1,356.97 |
| 1992 | 3,856.00 | 5,122.72 |
| 1993 | 15,060.00 | 19,836.70 |
| 1994 | 12,834.09 | 16,462.93 |
| 1995 | 6,341.61 | 7,821.20 |
| 1996 | 15,745.78 | 18,514.06 |
| 1997 | 14,807.38 | 16,450.76 |
| 1998 | 1,859.75 | 1,963.39 |
| 1999 | 3,444.37 | 3,444.37 |
| 2000 | 3,239.670 | 3,239.60 |

(Tr. at 54-55).

Plaintiff earned no income from 2001 through 2004 (Tr. at 65).

**B.    *SUMMARY OF MEDICAL RECORDS***

On January 22, 1987, plaintiff saw Mou Chern, M.D., a general practitioner, complaining of insomnia (Tr. at 125, 231, 278).  Plaintiff denied depression.  Dr. Chern prescribed Restoril.

On November 29, 1991, plaintiff returned to see Dr. Chern and complained of being depressed (Tr. at 125, 231).  Dr. Chern wrote, "Why?"  Plaintiff wanted his prostate checked as he was worried about enlargement.  Dr. Chern

7

diagnosed depression and prescribed an illegible medication.

On January 29, 1996, plaintiff saw Dr. Chern complaining of his left hand hurting (he noted a year ago he fell out of a barn loft but had no fractures). He said he had a knife-like pain in his back at times. Dr. Chern diagnosed muscle strain, depression, and peripheral neuritis[1] or nerve root compression syndrome of the thoracic and lumbar spine (Tr. at 123-124, 231-232). Dr. Chern gave plaintiff Trazodone and three of some illegible medicine.

On February 29, 1996, plaintiff saw Dr. Chern and complained that he was "still hav[ing] trouble with legs not working properly, also trouble with feeling in fingers, back feels wrong, neck hurts, meds aren't helping." Dr. Chern noted that plaintiff's bilateral arm and hand strength were normal, he had no gait disturbance, he had tenderness in his mid thoracic spine (123, 232). Dr. Chern recommended further evaluation by a neurologist, Dr. Parks.

On August 15, 1996, plaintiff returned to see Dr. Chern (Tr. at 123-124, 232). Most of the record is illegible, except plaintiff complained of "nerves", "drinks beer very

---

[1]Failure of the nerves that carry information to and from the brain and spinal cord. This produces pain, loss of sensation, and inability to control muscles.

8

often [illegible]". He tried detox, it helped for a short time, no tremor. Dr. Chern assessed depression, insomnia, and alcoholism and he prescribed Trazodone.

On September 25, 1998, plaintiff saw Dr. Chern. The notes state that plaintiff was living in Kansas City but is "back here". "States that you used to give 6 mos. supply of Trazodone 100 mg." Dr. Chern assessed depression, insomnia, and chronic alcoholism. He prescribed Trazodone and Prozac.

On February 24, 1999, plaintiff saw Mou Chern, M.D., for pink eye (Tr. at 121, 234).

On March 10, 1999, plaintiff saw Dr. Chern (Tr. at 121, 234). There is almost no writing on the record, but what little is there is illegible other than a prescription for Ciloxan (an antibiotic) for seven days.

On September 14, 1999, plaintiff saw Dr. Chern and requested Zoloft rather than Prozac (Tr. at 121-22, 234). Plaintiff stated that he was having shortness of breath. The records reflect that plaintiff was smoking one pack of cigarettes per day.

On June 10, 2000, plaintiff saw Dr. Chern for refills on his medication (Tr. at 122, 235). "Prozac 20 mg daily and Trazodone 100 mg h.s. They work well, has no problems tolerating it. Feels OK, no complaints." Dr. Chern

9

refilled plaintiff's Prozac and Trazodone.

On June 1, 2001, plaintiff saw Mou Chern, M.D., for depression (Tr. at 119, 236). Plaintiff stated that he had been taking Prozac, but he stopped taking it about a month earlier because it was expensive and did not seem to help. He stated that he had taken Paxil in the past and it had not helped. Plaintiff said he had been taking Trazodone for the past 16 years and "wants to stop". Dr. Chern gave plaintiff samples of Zoloft.

On July 11, 2001, plaintiff returned to see Dr. Chern (Tr. at 119). "[Patient] says Zoloft helping, says you told him he could get more samples if they helped."

On October 12, 2001, plaintiff told Dr. Chern that he would like to try Prozac (Tr. at 119, 236). "x5" is written and circled. I am assuming Dr. Chern provided plaintiff with five samples of Prozac.

On July 9, 2002, plaintiff returned to see Dr. Chern (Tr. at 120, 237). He stated that he had been depressed for "quite a while" and would like to be restarted on antidepressants and would like a refill on Trazodone, which he had not been taking for the past three months.

On August 27, 2002, plaintiff saw Dr. Chern at the request of the Division of Family Services (Tr. at 120,

10

237).  Plaintiff said he had been depressed for the past three to four months, he was feeling short of breath, and "real nervous".  He reported that he "messed up" his hip and back in 1996 when he fell.  Dr. Chern diagnosed hypertension, depression, and chronic alcoholism.

On October 23, 2002, plaintiff was seen at Missouri Ozarks Community Health (Tr. at 188).  He complained of a runny nose and depression for the past 25 years.  He stated that he could not keep a job.  There is a place on the form for evaluation of whether plaintiff was alert or oriented, his mood, affect, etc., but none of that was completed by the evaluator.  The assessment was depression, and plaintiff was proscribed Prozac.

On January 28, 2003, plaintiff saw Ronald Buening, D.O., at St. John's Health System (Tr. at 126-127).  Portions of Dr. Buening's report read as follows:

> HISTORY OF PRESENT ILLNESS:  The patient states he has trouble breathing.  This has been going on for quite some time on an intermittent basis.  He states he has back and neck trouble.  He suffered a fall from scaffolding in 1996 and has had trouble since then.  He was seen at that time and apparently no fractures were made note of.  He also has hip trouble that has been off and on since his fall in 1996 as well and he complains of depression that has gotten a lot worse over the last couple of years.

* * * * *

11

CURRENT MEDICATIONS:  Prozac 20 mg; Trazodone;
ibuprofen 800 mg and pills for gas.

* * * * *

SOCIAL HISTORY:  The patient has been married times two
and divorced times two.  He has one living child who is
apparently in good health.  He drinks five cups of
caffeine per day.  He smokes 1 1/2 packs of cigarettes
per day.  He is currently unemployed.  He apparently
has been trained as a carpenter in the far past.  The
patient drinks pretty much on a daily basis.  He says
that he drinks four to five beers, five or six days out
of the week. . . .

PHYSICAL EXAMINATION:
GENERAL:  The patient is alert, oriented, and he has a
stuttering speech, and he is very slow in following
directions, although he does accomplish the task
eventually.
HEENT:  . . .  [T]here is certainly the odor of alcohol
about him.

No dependent edema is noted.  Gait is normal.  His
station is normal.  Range of motion [in shoulders,
elbows, wrists, knees, hips, ankles, cervical spine,
and lumbar spine essentially normal].  The patient is
able to do a deep squat and stand without difficulty.
He can tandem walk without difficulty.  He can walk on
his heels without difficulty.  Deep tendon reflexes are
2+ symmetrically in both upper and lower extremities
and I can detect no evidence of muscle spasm or sensory
loss in either upper or lower extremity at the present
time.  The patient states that he has "spells".  he
describes them as "almost falling down and near
fainting spells."  He states that he has one of these
about every two weeks.  He denies any injury to himself
when he has these spells.  He describes this as a
brief, one second loss of equilibrium, however, it is
very difficult for him to try to describe this
sensation.  I can detect no wheezing, rales, or rhonchi
in either pulmonary field.  His gait is normal and he
does not need the use of an assistive device to walk.

12

> I do believe that the patient does have an emotional or
> mental disorder.  He certainly has some intellectual
> delay.  He has a tendency to ramble with tangential
> thinking and I certainly feel he has a component of
> depression along with this and probably a psychiatric
> consult would be in order.  I feel like the patient can
> sit, stand and walk for a typical eight hour workday
> with the usual number of breaks without significant
> difficulty. I feel like he could frequently lift 25
> pounds on a regular basis.  I feel like handling small
> objects would pose no problem. Hearing, speaking and
> traveling pose no significant difficulty at this time.

(Tr. at 126-127).

On January 29, 2003, plaintiff was seen at Missouri
Ozarks Community Health (Tr. at 189).  Plaintiff complained
of shortness of breath, cough, congestion, and a slight
headache.  "Someone in doctor's Hospital told patient he
might have emphysema."  Plaintiff was smoking two packs of
cigarettes per day.  Plaintiff had decreased breath sounds,
no rales or crackles.  The doctor assessed chronic
obstructive pulmonary disease and sinusitis.  The doctor
prescribed AeroBid [used to prevent asthma attacks and other
conditions involving inflammation of the lung tissues],
Allegra-D [an antihistamine], and another illegible
medication for ten days.

On February 7, 2003, plaintiff was seen at Missouri
Ozarks Community Health (Tr. at 190).  Plaintiff complained
of pain in his left arm for about three hours and he was

13

feeling weak.  Plaintiff had no shortness of breath, no
chest pain or pressure, no chills, no sweats.  He was
diagnosed with anxiety.  He was educated on the symptoms of
heart attack and what to do.

On February 20, 2003, plaintiff saw David Lutz, Ph.D.,
a Clinical Psychologist, after having been referred by
Disability Determinations (Tr. at 128-133).  Portions of Dr.
Lutz's report read as follows:

PRESENTING PROBLEM
Mr. Cooper, whose stated age was 50, reported that he
suffers from depression.  He explained that he is
"terribly unhappy."  He was not sure to what to
attribute his problems, but stated, "I guess I see my
life as a real big flubup." . . .  He suggested that he
has lost interest in previously enjoyable activities,
such as raising cattle. . . .  He stated that at times,
he has wished that he was dead.  He suggested that he
has had times when he did not want to get out of bed,
but could not describe any incidents in which he could
not get going.  He believed that he has had such
feelings for much of his life, but felt that his
feelings have intensified for several years . . . .

Mr. Cooper reported that he is anxious when he is
around others.  He stated that he would like to go to
church, but has felt uncomfortable in such settings.
He suggested that he has frequently avoided situations,
such as public speaking situations, as far back as high
school.  He indicated that he has tended to avoid
situations with unfamiliar people.  He did not describe
a great fear of embarrassment.

HISTORY
Mr. Cooper reported that he graduated from high school.
. . .  He said that he enjoyed school, stating that he
liked sports and being around other students. . . .  He
stated that he generally got along well with teachers

14

and other students, stating that he once was voted the friendliest person in school.

Mr. Cooper reported that he drinks alcohol regularly, stating that four times weekly he drinks four beers. . . . . He indicated that he drank more heavily in the past, stating that he drank most about seven years ago when his mother was hospitalized in a nursing home due to Alzheimer's disease. He stated that he went to bars regularly for about a year at that time, which caused him problems at work as he was hung over. He reported that he experienced a DWI about 13 years ago, and had his license suspended for ten years. He said that he was charged with a felony, and incarcerated for six months. He indicated that he has been charged five times with DWI offenses. He stated that family members have been greatly concerned with his alcohol usage. He said that he has experienced blackouts, but not withdrawal symptoms.

Mr. Cooper reported that he has used marijuana occasionally by which he meant possibly once every month or two. He indicated that his last usage was two months ago. He reported that about 29 years ago, he used LSD once. . . .

FAMILY HISTORY
Mr. Cooper reported that he has lived alone for 15 years. . . . He stated that he has been married twice. He said that his first marriage lasted three months, which ended because he was physically abusive toward his wife. . . . He reported that his second marriage lasted five months, which ended for similar reasons. . . .

SOCIAL HISTORY
Mr. Cooper reported that he has two neighbors with whom he has regular contact. He stated that he helps once neighbor with his cattle. "It's good to have somebody to visit with. It's very important." He suggested that he was much more outgoing in the past. He explained that he had friends in school, and went bowling when he worked. He also had friends at church, but corrected himself to say that he has often struggled around others. . . .

15

PHYSICAL COMPLAINTS
. . . He reported that he took Prozac about seven
years ago for a few months and again about five years
ago, but could not afford to continue. He said that he
resumed taking the medication about three to four
months ago. He said that he takes the medication as
prescribed, and has found them helpful in lessening
depression . . .

EMPLOYMENT HISTORY
. . . He reported that his longest job was for four
years after high school in oil fields, where he worked
for his father. . . . He stated that he generally got
along with supervisors and coworkers on his different
jobs.

DAILY ACTIVITIES
Mr. Cooper reported that he gets up about 7:30 a.m.,
and drinks coffee. . . . He stated that he prepares
his meals as he does the cooking. . . . He stated that
in the afternoon and evening, he helps his neighbor
with cattle. He may ride with his neighbor to buy
groceries, although he can do his shopping himself. . .
.

MENTAL STATUS
. . . Mr. Cooper arrived about 15 minutes early for
the interview, stating that he drove unaccompanied. He
was responsive and cooperative. . . . He did not
exhibit any obvious dysphoria. . . . His judgment is
limited as evidenced by his continued usage of alcohol
despite his history, including depression. . . . He
seemed able to understand and respond to basic to
normal conversation. He generally was able to respond
appropriately, but there were some lapses when he
seemed to become confused. . . . He did not evidence
any significant distressed affect, or unusual or
bizarre behavior. He reported that his behavior during
the interview was typical of his behavior in general.

Mr. Cooper denied having had hallucinations, paranoia,
delusions, ideas of reference, compulsions, or
obsessions.

16

Mr. Cooper was oriented to time, person, and place.  He remembered correctly six digits forward and four digits backward.  He counted backward from 20 to 1 in nine seconds with no errors.  He said the alphabet in nine seconds with no errors.  He did serial threes from 1 to 39 in 21 seconds with one error.  He did serial sevens backward from 100 to 37 in 45 seconds with no errors.  On proverbs, to chickens, he responded, "You don't know for sure if everything's going to come out just like you thought it was."  To spilled milk, he stated, "Things are going to happen that you don't want to happen."  To glass houses, he stated, "If you're delicate, don't be trying to be a bully."  He remembered correctly three of three things immediately, and three of three things after five minutes.  He remembered correctly 15 of 15 items on the Rey test.  His attention and concentration seemed variable.  When asked to do specific tasks, such as on the Mental Status items, he stayed focused.  When talking in the interview, he seemed to wander more.  Otherwise, his short term memory and long term memory were consistent with his general intellectual functioning, which I would estimate to be in the low average to average ranges.

FINANCIAL AFFAIRS
Mr. Cooper reported that he manages his finances.  He stated that he can count change and write checks.  He said that he receives general relief and Medicaid. . . .

DIAGNOSIS
Based on the client's subjective report of depression, and observations of occasional confusion during this examination, the most appropriate diagnoses are likely to be:

Axis I:   Major depression, moderate to severe, recurrent.  Described some likely bouts of major depression.
Dysthymic disorder, moderate, early onset.  He suggested that he has experienced depression for many years.
Alcohol dependence.  Given his extensive history, he likely continues to engage in

17

abusive (on at least an occasional basis)
                    behaviors.

          Axis II:  Avoidant characteristics.  It might be better
                    to characterize this as social anxiety.

          Axis III: Back and hip problems, lung difficulties.

          Axis IV:  Physical problems, unemployment, financial
                    difficulties, living alone.

          Axis V:   GAF = 50[2] (Current).  Moderate to severe
                    symptoms.

     MEDICAL SOURCE STATEMENT
     Mr. Cooper seemed able to understand and remember
     simple and moderately complex instructions, and
     possibly complex instructions.  He seemed able to
     sustain concentration and persistence on simple and
     moderately complex tasks, but would have difficulty
     with complex tasks.  He seemed able to interact in
     moderately demanding social situations.  He seemed able
     to adapt to his environment.  I assumed that his
     alcohol usage was at least partly responsible for some
     of his difficulties.  If this is not the case, then
     these ratings would need to be lowered.

(Tr. at 128-132).

     On March 11, 2003, Geoffrey Sutton, Ph.D., a licensed

psychologist, completed a Mental Residual Functional

Capacity assessment (Tr. at 134-136).  He found that

plaintiff is not significantly limited in the following:

_____

     [2]A Global Assessment of Functioning ("GAF") of 41 to 50
means serious symptoms (e.g., suicidal ideation, severe
obsessional rituals, frequent shoplifting) or any serious
impairment in social, occupational, or school functioning
(e.g., no friends, unable to keep a job).

18

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

19

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

He found that plaintiff is moderately limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to interact appropriately with the general public

(Tr. at 134-135).

That same day, Dr. Sutton completed a Psychiatric Review Technique (Tr. at 138-151). He found that plaintiff suffers from affective disorders and substance addiction disorders (Tr. at 138). His affective disorders are based on depressive syndrome[3] characterized by anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, and feelings of guilt or worthlessness (Tr. at 141). Dr. Sutton found that plaintiff has no restriction of activities of daily living; moderate difficulties in

---

[3]The form states "characterized by at least four of the following" but only three have been marked.

20

maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation (Tr. at 148). In support of his findings, Dr. Sutton wrote the following:

The claimant alleged depression along with physical health concerns as conditions affecting work after 9-00.

Medical evidence:  Notes from Dr. Chern revealed a record of treatment by medications for depression.  An exam by Dr. Buening in 1-03 found evidence for depression and intellectual delay.  No psychiatric hospitalizations were noted.  Dr. Lutz saw the claimant for a Psych CE [consultative exam] on 2-20-03.  The Dr. identified depressive symptoms noted in [Listing] 12.04 and found evidence for recent alcohol use.  Responses to MSE [mental status exam] questions suggested some limitations in cognition to the low average or in some cases, average range.  The Dr. believed the claimant could perform simple to moderately complex tasks assuming alcohol was a factor for some difficulties.

Other evidence:  The FO report found no problems in 14 categories during a face-face interview; (e.g., he did not present with problems of concentration or understanding).  The claimant completed his own Activities of Daily Living form.  He noted that he needs to concentrate "hard" sometimes.  He is able to shop without help and perform chores.  He drives and goes out at least once per day.

Credibility:  The allegations are mostly credible.  He has a mental MDI [medically determinable impairment] and there are some restrictions related to work.

Recommended determination:  The claimant has an MDI with evidence from treatment records and CE.  He has some limited cognitive ability which would restrict his range of work.  He appears able to understand basic communication, interact socially and adapt to his environment.  His performance at the CE was without

21

Drug and Alcohol. This assessment is based on his presentation without alcohol present and in that sense, Drug and Alcohol is not material to this determination. His descriptions of functioning in the Activities of Daily Living were considered along with the opinions of the CE Dr. An MRFC [mental residual functional capacity] appears appropriate for simple to moderately complex tasks.

(Tr. at 150).

On March 17, 2003, plaintiff was seen at Missouri Ozarks Community Health (Tr. at 191). Plaintiff complained of cold symptoms and left knee popping. The doctor prescribed Ibuprofen and cold/sinus medications.

On March 21, 2003, plaintiff had a pulmonary function test done (Tr. at 154-158). Plaintiff reported that he smoked one pack of cigarettes per day and had smoked for 25 years (Tr. at 158).

On April 11, 2003, plaintiff walked into the office of Thomas Zurkowski, M.D., and requested to see a physician and counselor (Tr. at 162, 222). Plaintiff was oriented to person, place, time, and situation; his affect was appropriate; his mood was described as euthymic, which means joyful, moderation of mood, i.e., not manic or depressed. The doctor did not check the boxes marked depressed/sad, anxious, or irritable. His thought processes were goal-directed, thought content was non-delusional. Nothing else

22

is legible on this "check the box" type form.

On April 16, 2003, plaintiff was seen at Missouri Ozarks Community Health complaining of high blood pressure and feeling weak for the past two days (Tr. at 193). His blood pressure was 148/94. He was diagnosed with hypertension and depression. The doctor diagnosed Paxil and HCTZ for high blood pressure.

On May 10, 2003, plaintiff returned to see Dr. Zurkowski for a routine visit (Tr. at 163, 223). Plaintiff was taking Prozac. He reported that he believed the generic version of Prozac made his depression worse, and the person completing this form wrote, "(!?!)". Plaintiff's grooming and hygiene were good, his affect was appropriate, his mood was depressed/sad and arduous. His motor activity was normal, his speed was normal, articulation was good and coherent. Thought content was non-delusional. Intellectual functioning was below average, immediate memory was good, recent memory was fair, intermediate memory was fair, remote memory was fair, attention was fair, insight was poor, and judgment was poor. Dr. Zurkowski assessed bipolar mood disorder and depression. He wrote, "thinks he's developing emphysema, wants to discontinue smoking." Global Assessment of Functioning ("GAF") was 75 (if symptoms are present, they

23

are transient and expectable reactions to psychosocial stressors). Dr. Zurkowski prescribed name brand Prozac and Wellbutrin.

On May 16, 2003, plaintiff was seen at Missouri Ozarks Community Health (Tr. at 195). He complained that his blood pressure was not controlled and he was having problems with shortness of breath. His blood pressure was 158/78. Plaintiff had a nebulizer treatment and this resulted in improved air movement with decreased effort. He was assessed with hypertension and reactive airway disease. He was prescribed Lisinopril for high blood pressure and Albuterol which relaxes muscles in the airways to improve breathing.

On May 19, 2003, plaintiff saw Michael Ball, D.O. (Tr. at 184). Plaintiff stated that he had a motor vehicle accident in 1996 and also fell 12 feet in 1996. Plaintiff's blood pressure was 110/80. Dr. Ball ordered an x-ray of plaintiff's lumbar spine.

On May 29, 2003, plaintiff was seen at Missouri Ozarks Community Health (Tr. at 196). Plaintiff complained of cold symptoms, and he said he stopped taking his blood pressure medicine nine days earlier because he believed it made his cough worse. Plaintiff's blood pressure was 138/84. He was

24

assessed with hypertension and was prescribed Claritin and Teveten, which prevents the narrowing of blood vessels.

On June 5, 2003, plaintiff was seen at Missouri Ozarks Community Health complaining of stomach pain, gas, and burping (Tr. at 197). "Ate burrito and lots of coffee - got some relief after taking Pepcid." Plaintiff was diagnosed with acid reflux.

Plaintiff returned to see Dr. Ball on June 9, 2003 (Tr. at 184). Plaintiff said he was still having trouble with his back, and he said he was depressed a lot. Plaintiff's blood pressure was 120/76. Dr. Ball prescribed Mobic, a non-steroidal anti-inflammatory.

On July 24, 2003, plaintiff was seen at Missouri Ozarks Community Health for medication refills (Tr. at 198). His blood pressure was 140/84. Plaintiff reported that he stopped taking HCTZ [for high blood pressure] and Mobic [a non-steroidal anti-inflammatory]. He complained of muscle aches in his legs. The doctor prescribed Spironolactone for hypertension. The doctor told plaintiff to take Mobic as needed, but not to combine Mobic and Ibuprofen.

On August 7, 2003, plaintiff returned to see Dr. Ball (Tr. at 185). Plaintiff stated that he had been having knee pain for a long time and wanted Dr. Ball to look at an x-ray

25

plaintiff brought with him.  Dr. Ball again prescribed Mobic, the same dose as two months earlier.

On August 9, 2003, plaintiff returned to see Dr. Zurkowski for a routine follow up (Tr. at 164, 224). Plaintiff was taking Prozac and Wellbutrin, but the notes say "patient plans to stop Prozac."  Plaintiff had no adverse effects from his medication.  Plaintiff's grooming and hygiene were good, his affect was appropriate, his mood was depressed/sad, motor activity was normal, speech was normal, articulation was good, thought content was non-delusional.  Intellectual functioning was "average to below average", immediate memory was good, recent memory was good, intermediate memory was fair, remote memory was fair, attention and concentration were good, insight was fair, and judgment was fair.  Dr. Zurkowski assessed bipolar mood disorder and then wrote "I'm questioning its presence." He discontinued plaintiff's Prozac, continued him on Wellbutrin, and added Trazodone.

On August 22, 2003, plaintiff was seen at Missouri Ozarks Community Health where he had a colonoscopy which was normal (Tr. at 200).  Plaintiff stated that he worried too much on Spironolactone and wanted to go back on HCTZ. Plaintiff's blood pressure was 124/72.  The notes state that

26

plaintiff's hypertension was controlled.  Plaintiff was told
to continue using Pepcid for two more months for acid
reflux, and then discontinue.

On September 23, 2003, plaintiff was seen at Missouri
Ozarks Community Health for a following up (Tr. at 201).
Plaintiff reported that he was feeling better.  The
assessment lists hypertension under control and depression
in a "steady state".

On September 26, 2003, plaintiff saw Dr. Ball (Tr. at
185).  At this visit, plaintiff complained that his back was
hurting, the muscles in his legs were hurting, his right hip
was hurting, he had been having these problems off and on
for about ten years, and he was having trouble walking.  Dr.
Ball recommended an orthopedic consult with Dr. Michael
Clarke.

On September 27, 2003, plaintiff saw Dr. Zurkowski for
a routine follow up (Tr. at 165, 225).  Plaintiff was
oriented to person, place, time and situation; his grooming
and hygiene were fair; his affect was appropriate; his mood
was depressed/sad.  His assessment was "r/o [rule out]
bipolar mood disorder, major depression".  His GAF was 75
(if symptoms are present, they are transient and expectable
reactions to psychosocial stressors).  Dr. Zurkowski

27

continued plaintiff on his medications unchanged.

On October 9, 2003, plaintiff saw Michael Clarke, M.D., an orthopedic doctor, after having been referred by Dr. Ball (Tr. at 171). "He has multiple complaints primarily neck and back pain. . . . He states his legs are weaker even though I cannot find any lateralizing signs, and he seems to have normal strength to examination. . . . He has had major depression throughout his life. He does not seem particularly depressed today during the visit to the office. We are treating him with head Holter traction, and increased the anti-inflammatory medication".

On October 29, 2003, plaintiff had blood drawn for lab work at Missouri Ozarks Community Health (Tr. at 202). His blood pressure was 119/82. Plaintiff's triglycerides were high at 222 (should be below 150), his cholesterol was high at 233 (should be below 200), his HDL cholesterol was low at 37 (should be at least 40), his LDL cholesterol was high at 152 (should be below 130), his cholesterol/HDLC ratio was high at 6.3 (should be less than 5.0), and his glucose was high at 153 (Tr. at 219).

On November 3, 2003, plaintiff was seen at Missouri Ozarks Community Health to discuss his lab work (Tr. at 204). He complained that walking makes his back feel like

28

he has a pinched nerve.  The doctor discussed the results of plaintiff's lab work and discussed a 2,000 to 2,500 calorie per day diet.  The doctor started plaintiff on Glucophage for diabetes and told him to walk for ten minutes three times per week.

On November 10, 2003, plaintiff was seen at Missouri Ozarks Community Health for a follow up on diabetes (Tr. at 205).  His blood pressure was 140/84.  Plaintiff admitted to consuming whiskey and beer.  Plaintiff was told not to consume any more than one beer or one mixed drink per week.  Plaintiff had stopped taking his Wellbutrin because he thought it increased his blood pressure.  The doctor again reviewed with plaintiff a 2,500 calorie per day diet.

On November 11, 2003, plaintiff returned to see Dr. Clarke (Tr. at 172).  His chief complaint was numbness and pain in his right upper extremity.  "He has some moderate degenerative changes in the spine. . . .  He is having more pain in the right lower extremity and he states his right leg is weaker.  He has lost about 4 pounds, but still is overweight.  I am not sure he has been using his head halter traction as prescribed last time."  Dr. Clarke scheduled a bone scan, a neurology consult, and prescribed Flexeril.

29

On November 17, 2003, plaintiff was seen at Missouri Ozarks Community Health for a recheck on his diabetes (Tr. at 206). His blood pressure was 120/62. Plaintiff said he had restarted his Wellbutrin.

On December 2, 2003, plaintiff was seen at Missouri Ozarks Community Health for a recheck (Tr. at 207). Plaintiff's blood pressure was 138/88. He reported that he stopped taking his Mevacor (cholesterol medication) and he also stopped taking his blood pressure medication. Plaintiff agreed to start taking HCTZ (for blood pressure) again. The doctor changed plaintiff's Mevacor to Niaspan (to lower cholesterol).

On December 6, 2003, plaintiff saw Dr. Zurkowski for a routine follow up (Tr. at 166, 226). Plaintiff was taking Wellbutrin. Plaintiff was oriented to person, place, time, and situation; his grooming and hygiene were good; his affect was appropriate; his mood was depressed/sad; his motor activity was normal and agitated; his speed was normal; his articulation was good. Dr. Zurkowski found plaintiff's thought content delusional. "Complains of social phobia". He assessed depression and tobacco addiction. He prescribed Lexapro for depression and Trazodone.

Case 6:05-cv-03246-REL   Document 15   Filed 04/11/06   Page 30 of 64

On December 16, 2003, plaintiff was seen at Missouri
Ozarks Community Health for a follow up (Tr. at 208).  His
blood pressure was 156/90.  His blood sugar had been 200-300
the previous week (should be below 100).  The doctor
continued plaintiff on his current medications and told him
to follow up in two weeks.

On December 19, 2003, plaintiff returned to see Dr.
Ball for a check up (Tr. at 186).  Plaintiff's blood
pressure was 130/80.  Dr. Ball assessed diabetes and
prescribed no medication.

On December 23, 2003, plaintiff returned to see Dr.
Clarke (Tr. at 173).  Plaintiff's exam was unchanged from
previous.  Dr. Clarke ordered a caudal steroid injection and
started plaintiff on Bextra.  Written on this medical form
is the following notation:  "2-11-04 Multiple attempts to
contact patient by phone since 2-7-04.  S. Young, RN".

On January 3, 2004, plaintiff saw Dr. Zurkowski for a
routine follow up (Tr. at 167, 227).  Plaintiff was taking
Lexapro and Trazodone with no side effects.  Plaintiff was
oriented to person, place, time, and situation; his grooming
and hygiene were fair; his affect was appropriate; his mood
was depressed/sad; his motor activity was normal; his speech
was normal; his articulation was poor and slurred.

31

Plaintiff's thought content was non-delusional.  His
intellectual functioning was below average, his immediate
memory was fair, his recent memory was fair, his
intermediate memory was fair, and his remote memory was
fair.  Plaintiff's attention/concentration was poor and his
judgment was poor.  Dr. Zurkowski assessed depressive
disorder, rule out bipolar mood disorder.  His GAF was 75
(if symptoms are present, they are transient and expectable
reactions to psychosocial stressors).  The form says, "Meds
prescribed" and Dr. Zurkowski checked "none".

On January 13, 2004, plaintiff was seen at Missouri
Ozarks Community Health for a recheck (Tr. at 209).  His
blood pressure was 140/82.  The doctor continued plaintiff
on his medication.

On January 28, 2004, plaintiff was seen at Missouri
Ozarks Community Health for a recheck (Tr. at 210).  His
blood pressure was 124/82, and he said his blood sugar had
been 112-120 when not using sugar.  Plaintiff reported that
he discontinued taking Bextra and started using Mobic.  The
doctor continued plaintiff on his current medications.

On February 9, 2004, plaintiff was seen at Missouri
Ozarks Community Health for a blood pressure check (Tr. at
211).  His blood pressure was 140/88.

32

On February 12, 2004, plaintiff was seen at Missouri Ozarks Community Health (Tr. at 212). He complained of pain between his shoulder blades, feeling bloated, and pain in his back for the past seven days (Tr. at 212). The doctor gave plaintiff a ten-day sample of medication for irritable bowel syndrome, but no other medication.

On February 19, 2004, plaintiff was seen at Missouri Ozarks Community Health for a review of lab work (Tr. at 213). His blood pressure was 136/76. Plaintiff was assessed with acid reflux, irritable bowel syndrom, and a plantar wart. In an undated form following this medical report, plaintiff stated that he was consuming beer and whiskey and that he was smoking 1 1/2 packs of cigarettes per day (Tr. at 214). His "chronic problem list" was non-insulin dependent diabetes mellitus, hypertension, depression, chronic obstructive pulmonary disease, and hyperlipidemia.

On March 9, 2004, plaintiff returned to see Dr. Clarke for an evaluation for Medicaid disability at the request of the Division of Family Services (Tr. at 174-177). He noted that plaintiff had been taking Bextra in the past and thought that helped but he stopped taking it. "Apparently he is not taking any significant medication other than

33

possibly an occasional aspirin. . . . He has worked all his
life in the oil fields and as a carpenter and does hauling
of wood. He states he just wears out too easily and cannot
do his work any more. He does have some emphysema and is a
chronic smoker. . . . I have taken x-rays again today and
compared them to his x-rays taken about eight to nine months
ago. There is no significant change. His hips are well
maintained. Sacroiliac is satisfactorily maintained. He
has some mild-to-moderate facet joint arthritis especially
at L4-L5 and L5-S1 in his lower lumbar spine. Cervical
spine shows a little more advanced spondylosis with some
degeneration at C4-C5, C5-C6, and C6-C7, the usual location
with osteophytosis anteriorly and some thinning of the joint
space. His neck exam shows a decreased range of motion,
almost 50% decreased range of motion, primarily in lateral
bending, but somewhat in flexion, extension, and rotation. .
. . [H]e does have some degenerative changes especially
noted in his cervical spine. I do not think it is serious
enough to warrant disability under the definition given. I
do believe his symptoms are due to his lung disease causing
him to have poor stamina." Dr. Clarke completed the form
from the Division of Family Services and checked "does not
have" a mental and/or physical disability which prevents him

34

from engaging in employment.

On March 12, 2004, plaintiff saw Dr. Zurkowski for a routine follow up (Tr. at 168, 228).  Plaintiff's grooming and hygiene were good, his affect was appropriate, his mood was depressed/sad, his motor activity was normal, his speech was normal but slow, his articulation was mumbled but coherent.  With regard to plaintiff's thought content, Dr. Zurkowski checked "nondelusional" then crossed that out and checked "delusional". He assessed bipolar mood disorder (rule out obsessive compulsive disorder), and social phobia. Plaintiff's GAF was 75 (if symptoms are present, they are transient and expectable reactions to psychosocial stressors), and his medications were continued unchanged.

That same day, on March 12, 2004, Dr. Zurkowski completed a Medical Source Statement Mental (Tr. at 160). Dr. Zurkowski found that plaintiff was not significantly limited in the ability to carry out very short and simple instructions.  He found that plaintiff was moderately limited in the following:

- The ability to understand and remember very short and simple instructions

- The ability to sustain an ordinary routine without special supervision

35

- The ability to ask simple questions or request assistance

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

He found that plaintiff was markedly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

36

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to set realistic goals or make plans independently of others

He noted that plaintiff's diagnosed condition is bipolar mood disorder (Tr. at 161). Under "remarks", Dr. Zurkowski wrote, "This pt [patient] has been markedly limited in his work. He admits to back problems in addition to mental conditions. Please evaluate medical conditions." When asked whether the individual has a history that includes drug and/or alcohol abuse or addiction, Dr. Zurkowski checked "no" (Tr. at 160).

On April 24, 2004, plaintiff saw Dr. Zurkowski for a routine follow up (Tr. at 169, 229). Plaintiff's grooming and hygiene were good, his affect was appropriate, his mood was depressed/sad and anxious, his motor activity was normal, his speech was slow, his articulation was mumbled but coherent. His thought content was delusional. Dr. Zurkowski assessed "rule out bipolar mood disorder, social phobia, rule out obsessive compulsive disorder".

37

On May 11, 2004, plaintiff returned to see Dr. Ball and complained that his knee was still hurting (Tr. at 186). His blood pressure was 148/100. Dr. Ball assessed diabetes, hypertension, and knee pain, and he prescribed Zestril for plaintiff's blood pressure.

On May 12, 2004, Dr. Ball completed a Medical Source Statement (Tr. at 180-182). Dr. Ball's diagnoses were diabetes mellitus, hypertension, and osteoarthritis in the knees. He found that plaintiff can frequently lift up to 25 pounds, occasionally lift 50 pounds, stand for four hours per day, sit for five hours per day, and sit and stand together for a total of six hours per day. He found that plaintiff can frequently push or pull, balance, bend, reach, handle, finger, and feel. He found that plaintiff can occasionally climb, stoop, kneel, and crouch. He found that plaintiff should avoid any exposure to hazards, machinery, and heights.

**C. *SUMMARY OF TESTIMONY***

During the June 4, 2004, hearing, plaintiff testified; and George Horne, a vocational expert, testified at the request of the ALJ.

38

### 1. Plaintiff's testimony.

At the time of the administrative hearing, plaintiff was 51 years of age, and he is currently 53 (Tr. at 251). Plaintiff was living alone in a mobile home in Ava, Missouri (Tr. at 251-252). His mobile home sits on 39 acres which he leases to someone who has cattle on the land (Tr. at 252).

Plaintiff's alleged onset date is July 12, 2001 (Tr. at 253). Since that time, he has done little odd jobs, helped fix fences, hauled firewood for people (Tr. at 253). He has not done those things for a long time (Tr. at 253). Plaintiff last worked on July 12, 2001, at Fastco (Tr. at 253-254). He called in sick twice during his 90-day probationary period and so he was fired (Tr. at 254). Plaintiff had called in sick because he was tired and was not feeling well (Tr. at 254). Plaintiff had difficulty doing the job at Fastco because he had pain in his shoulder blades and it was very painful to move his arms (Tr. at 254). He had to cut on the assembly line and it hurt his shoulder blades and arms (Tr. at 254-255).

Prior to working at Fastco, plaintiff worked on the assembly line at Copeland for about 45 days (Tr. at 255). Plaintiff missed work at Copeland because he was tired, and he "might have got a cold too" (Tr. at 256).

Plaintiff has suffered from depression for years (Tr. at 256). He sees Dr. Zurkowski (Tr. at 256). Plaintiff took Prozac for a few years but it did not help, and Dr. Zurkowski prescribed Lexapro and Seroquel which "seem to be helping" (Tr. at 257). Dr. Chern gave plaintiff the Prozac (Tr. at 257). He also has taken Trazodone for about 13 years to sleep (Tr. at 257). When asked how he was able to work with depression since he has had it for years, plaintiff said, "Well, right. Yeah. It, it's -- it's been difficult, but, but when, when it was difficult but -- the depression, yeah. It's caused me some problems." (Tr. at 258). Plaintiff could not explain why he now cannot work with his depression when he was able to for years (Tr. at 258). His attorney suggested maybe there were days when he was too depressed to get up or to go out, and plaintiff quickly agreed that was the case (Tr. at 259). He said a couple of days a week he is too depressed to get out (Tr. at 259). He testified that Dr. Zurkowski counsels him in addition to prescribing medication (Tr. at 260-261).

About eight to ten years ago, plaintiff fell 12 feet off a scaffold and landed on his head (Tr. at 261). He hurt his head, his hip, and his back (Tr. at 261). Dr. Clarke and Dr. Ball treated plaintiff for his back (Tr. at 261).

He has taken Ibuprofen, Mobic, and Bextra for his back (Tr. at 261-262). Those medications help (Tr. at 262).

Plaintiff has a stiff neck and soreness a couple times a month, but not really pain (Tr. at 262-263). Plaintiff's back pain feels like his upper body is trying to break off from his lower body (Tr. at 264). That back pain occurs about once every two months (Tr. at 264). On an average day, plaintiff has a hard time getting up, sitting down, and bending over (Tr. at 264). He also has trouble walking very far (Tr. at 265). On a daily basis, he has pain in his back, but it is not unbearable pain (Tr. at 265). Plaintiff thinks he could sit comfortably for 15 to 20 minutes at a time (Tr. at 265). He can stand ten to 20 minutes at a time (Tr. at 266). After walking about a quarter of a mile, plaintiff has to rest by lying down or sitting on the couch (Tr. at 266). Plaintiff can lift his tool box when he works on his pickup, and he can lift four gallons of gas and carry it (Tr. at 267). Plaintiff testified he could probably lift five pounds regularly without having pain (Tr. at 267).

Plaintiff has problems feeling with his hands, and he has quite a bit of numbness and tingling in his hands (Tr. at 268).

41

Plaintiff has hip pain all the time (Tr. at 269). His knees also give out when he is walking (Tr. at 270).

Dr. Clarke told plaintiff the best thing he could do for all of his problems is rest (Tr. at 269). Plaintiff alternates between sitting and lying down about three or four hours each day (Tr. at 269). This is because of his pain and because he is very tired (Tr. at 270).

Plaintiff's hypertension is controlled with medication (Tr. at 271).

Plaintiff testified that he is an alcoholic (Tr. at 273). He has had five or six DWI's in his lifetime, but the last one was about 15 years ago (Tr. at 273). He spent six months in the penitentiary for a DWI (Tr. at 273). At the time of the hearing, plaintiff was drinking about four beers twice a week (Tr. at 274). Plaintiff has cut down -- for about two or three years he drank a 12-pack of beer every day (Tr. at 274).

When plaintiff lost his last job in 2001, he was drinking about three or four beers per day (Tr. at 274). But his drinking did not prevent him from showing up for work or doing his job (Tr. at 275). Plaintiff feels like he has his drinking under control, although he knows he should not drink at all (Tr. at 275). When asked whether his

42

drinking interferes with his medication, plaintiff said,
"No, I don't believe it does." (Tr. at 275).

The ALJ asked plaintiff how he pays his bills since he
has no income (Tr. at 276).  Plaintiff testified that he
borrows money from his brother and he had a loan at the
bank, but now he cannot get any more loans (Tr. at 276).

Plaintiff testified that he would have seen Dr. Ball
more, but he did not have enough gas money (Tr. at 279).

Plaintiff drives about every other day (Tr. at 279).
He goes to the grocery store once a week, he prepares his
own meals, he does is own laundry (Tr. at 280).  Plaintiff
borrows his neighbor's brush hog and lawn mower and cuts his
grass, which takes about four hours (Tr. at 281).  The year
before the hearing, plaintiff had a "pretty good sized
garden" (Tr. at 281).  He dug and planted until he could not
do it anymore (Tr. at 281).  Plaintiff did not do a lot of
digging, he had a rotor tiller, and he would hoe the garden
once in a while (Tr. at 281).

Plaintiff gets together with friends and listens to
music and has coffee (Tr. at 282-283).  He also has coffee
with his aunt at a restaurant (Tr. at 283).

43

## 2. **Vocational expert testimony.**

Vocational expert George Horne testified at the request of the Administrative Law Judge.

He testified that plaintiff's past relevant work is as a carpenter, skilled medium to very heavy, and an assembler, which is semiskilled light work, but plaintiff performed it at the medium exertional level (Tr. at 284). The Dictionary of Occupational Titles number for the assembler position is 721.684-022 (Tr. at 284).

The first hypothetical involved a person with the medical limitations outlined by Dr. Ball, i.e., frequently lift up to 25 pounds, occasionally lift 50 pounds, stand for four hours per day, sit for five hours per day, and sit and stand together for a total of six hours per day. He found that plaintiff can frequently push or pull, balance, bend, reach, handle, finger, and feel. He found that plaintiff can occasionally climb, stoop, kneel, and crouch. He found that plaintiff should avoid any exposure to hazards, machinery, and heights (Tr. at 287). The vocational expert testified that such a person could not return to plaintiff's past relevant work, and the person could do no other work because of the ability to sit and stand for a total of only six hours out of an eight-hour work day (Tr. at 287).

44

The second hypothetical involved a person who could sit or stand or walk for eight hours each, lift 25 pounds frequently, and could handle small objects (Tr. at 288). The vocational expert testified that such a person could be a carpenter and could do plaintiff's past factory work, plus the person could perform the full range of medium, light, and sedentary jobs (Tr. at 288).

The next hypothetical involved a person with the same physical abilities as the person in hypothetical two with the added limitations as found by Dr. Zurkowski, i.e., moderate limitation in the following:

- The ability to understand and remember very short and simple instructions

- The ability to sustain an ordinary routine without special supervision

- The ability to ask simple questions or request assistance

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

And marked limitation in the following:

- The ability to remember locations and work-like procedures

45

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to set realistic goals or make plans independently of others

The vocational expert testified that such a person could not perform any of plaintiff's past relevant work (Tr. at 288). The person could also perform no other work due to marked limitations in regular attendance, working in

46

coordination or proximity to others, and the ability to complete a normal work day (Tr. at 289).

The fourth hypothetical involved a person also with the same physical limitations as those described in hypothetical two along with the following mental limitations:  The person needs to avoid high stress, fast paced activity, or activity that requires the person to adhere to explicit production quotas, deadlines, or schedules (Tr. at 289).  The person cannot perform work involving changing work settings, cannot sustain a high level of concentration, and cannot pay attention well enough to sustain a simple routine or repetitive task (Tr. at 289).  Finally, the person should avoid frequent or prolonged personal interaction with the public (Tr. at 289).  The vocational expert testified that such a person could not do any of plaintiff's past relevant work, but could perform medium, light, and sedentary unskilled work (Tr. at 290).  For example, the person could be a laundry worker II, with 1,000 jobs in Missouri and over 48,000 in the country (Tr. at 290).  He could be a cleaner, housekeeper, with 5,800 jobs in Missouri and more than 240,000 in the country (Tr. at 290).

47

## V.  FINDINGS OF THE ALJ

Administrative Law Judge David Fromme issued his opinion on November 23, 2004 (Tr. at 13-25). At step one of the sequential analysis, he found that plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 14). At step two, he found that plaintiff has severe impairments of depression, lumbosacral degenerative disc disease, cervical disc disease, and alcohol dependence (Tr. at 14). At step three, he found that plaintiff's impairments do not meet or equal a listed impairment (Tr. at 15).

After considering the evidence, the ALJ found that plaintiff has the residual functional capacity to lift and/or carry 25 pounds frequently on a regular basis; can sit for eight hours; can stand or walk for eight hours; can handle small objects without difficulty; can pay attention well enough to carry out a simple routine or repetitive tasks; cannot sustain a high level of concentration; is unable to sustain precision and attention to detail; is unable to perform high stress work such as fast paced work activity or work with explicit production quotas, deadlines, and schedules; and is unable to perform work requiring frequent and prolonged contact with the public (Tr. at 22).

48

Plaintiff is unable to perform his past relevant work (Tr. at 22).

At step five of the sequential analysis, the ALJ found that plaintiff could perform the job of cleaner/housekeeper, with 5,500 jobs in Missouri, and 240,000 jobs in the country (Tr. at 23). Therefore, plaintiff was found not disabled at step five of the sequential analysis.

## VI.   OPINION OF TREATING PHYSICIANS

Plaintiff argues that the ALJ erred in not giving controlling weight to the opinions of plaintiff's treating physicians, Dr. Ball and Dr. Zurkowski.

A treating physician's opinion is granted controlling weight only when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).

### MICHAEL BALL, D.O.

The ALJ had this to say about Dr. Ball:

Dr. Michael Ball's records cover . . . May 2003 to May 2004. During that time, the claimant complained of back pain in the beginning. By August he was also complaining of knee pain. By September, he also complained of right hip pain and pain in his leg

49

muscles and trouble walking.  Despite all the
complaints, he saw Dr. Ball one time [for] follow up on
December 19, 2003.  Apparently, the only diagnosis at
that time was diabetes.  He was seen one last time on
May 11, 2004 and only complained about his knees.  At
that time, he requested a Medical Source Statement from
Dr. Ball. . . .

The limitations set out by Dr. Ball in standing,
walking and sitting are not supported by the record.
He is a general practitioner, while the orthopedic
specialist saw only mild arthritic changes in the
lumbar spine.  He has only mild obstruct[ive] pulmonary
disease.  He has no other impairment which would limit
his ability to sit, stand and walk.

(Tr. at 18, 20).

The only real issues with Dr. Ball's Medical Source
Statement are his findings that plaintiff can only sit for
five hours per day, stand for four hours per day, and
sit/stand in combination for a total of six hours per day.
When he made that assessment, Dr. Ball's diagnoses were
diabetes mellitus, hypertension, and osteoarthritis in the
knees.  Plaintiff testified that his hypertension is under
control with medication.  There is no evidence that
plaintiff's diabetes causes problems with sitting or
standing.  Therefore, the osteoarthritis in plaintiff's
knees must be the basis for Dr. Ball's opinion that
plaintiff cannot stand for more than four hours, cannot sit
for more than five hours, and cannot sit and stand in
combination for more than six hours per day.

Dr. Ball first saw plaintiff on May 19, 2003. There was no complaint of knee problems, there was no examination that resulted in a finding of knee problems, and there was no treatment of knee problems on that visit.

Plaintiff next saw Dr. Ball on June 9, 2003. Again, there were no complaints of knee problems, no findings of knee problems, and no treatment for knee problems.

The next visit was August 7, 2003. On this visit, plaintiff for the first time stated that he had been having knee pain "for a long time." At this point in his medical history, plaintiff had mentioned on March 17, 2003, when he was seen at Missouri Ozarks Community Health that he had been having some left knee popping. The doctor there told plaintiff to take Ibuprofen. At plaintiff's follow up appointment at Missouri Ozarks Community Health one month later, he no longer complained of knee popping. So this complaint of knee pain to Dr. Ball on August 7, 2003, was a relatively new health problem. Dr. Ball prescribed the same dose of Mobic that plaintiff was already taking; therefore, there was no new treatment ordered for this new knee pain.

Plaintiff next saw Dr. Ball on September 26, 2003. On that date, he said nothing about his knees, but he complained of "trouble walking" with no further elaboration.

51

Dr. Ball recommended an orthopedic consult with Dr. Michael Clarke. Plaintiff saw Dr. Clarke on October 9, 2003, and failed to mention knee pain. Dr. Clarke found normal strength on examination. He prescribed an anti-inflammatory for plaintiff's other problems. On November 11, 2003, plaintiff again saw Dr. Clarke and complained about numbness in his arms and right leg weakness. He did not mention his knees. On December 23, 2003, plaintiff again saw Dr. Clarke and failed to mention any problems with his knees. Dr. Clarke found plaintiff's exam unchanged. Plaintiff's next visit with Dr. Clarke was March 9, 2004, for an evaluation for Medicaid Disability. Dr. Clarke noted that plaintiff was taking nothing more than an occasional aspirin for pain. Dr. Clarke found that plaintiff does not have a physical disability which prevents him from engaging in employment, and he noted that plaintiff's biggest problem was his smoking which was causing him to have poor stamina. Again, there was no mention of knee problems.

On May 11, 2004, plaintiff returned to see Dr. Ball after not having seen him for the past five months. At that time, plaintiff complained that his knee was still hurting; however, Dr. Ball did not prescribe any medication for plaintiff's knee.

52

During none of this time did plaintiff ever complain
that sitting or standing caused him any discomfort.  No
doctor ever recommended that plaintiff limit his sitting or
standing.  Plaintiff's knee problems certainly do not
support Dr. Ball's findings that plaintiff cannot stand for
more than four hours, sit for more than five hours, or sit
and stand in combination for more than six hours per day.
In fact, Dr. Ball found, in that same Medical Source
Statement, that plaintiff can occasionally kneel, which is a
peculiar finding coming from a doctor who found that
plaintiff's knee problems prevent prolonged sitting or
standing.

Not only do Dr. Ball's records (and the records of Dr.
Clarke, the orthopedic specialist recommended by Dr. Ball)
not support Dr. Ball's Medical Source Statement, the other
evidence in the record fails to support his findings.  On
January 28, 2003, Dr. Buening found that plaintiff had
normal range of motion in his knees and could stand, sit, or
walk for eight hours per day.  On November 3, 2003, a doctor
at Missouri Ozarks Community Health recommended that
plaintiff walk at least three times per week.  Plaintiff at
no other time complained of knee problems, and no other
doctor discovered any knee problems.

Because Dr. Ball's assessment involved only osteoarthritis of the knees, and because that assessment and his records and the other evidence in the record do not support his finding that plaintiff could stand for no more than four hours, sit for no more than five hours, or sit and stand in combination for no more than six hours per day, the ALJ did not err in failing to give controlling weight to Dr. Ball's opinion.

**_THOMAS ZURKOWSKI, M.D._**

The ALJ had this to say about Dr. Zurkowski:

On April 11, 2003, the claimant walked into the office of Thomas M. Zurkowski, M.D., asking for a physician and counselor. He said he had demented thoughts when he was on Prozac. This is not verified by any of the prior records. In fact, the claimant had repeatedly said he improved on Prozac. Dr. Zurkowski's notes about the claimant indicated that he was quite normal. At the May appointment, the claimant told him that he thought the generic Prozac made him worse. He also told the doctor that he thought he was getting emphysema and wanted to quit smoking. He was given name-brand Prozac and Wellbutrin. His Global Assessment of Functioning was set out at 75, indicating only very mild symptoms or very mild limitations of function. The claimant was seen again in August and said he was going to quit Prozac, but reported no adverse effects. The doctor had diagnosed bipolar disorder, but stated in this note that he was questioning its presence. He added Trazodone to the treatment. At the September appointment, GAF continued to be 75. In December 2003, despite reducing his cigarette consumption, he wanted to change anti-depressants, Dr. Zurkowski noted he was complaining of social phobias. He changed the claimant to Lexapro. In January & March 2004, the claimant GAF continued to

be assessed at 75.  In April 2004, the claimant was on
additional medications and it was noted that he had
expressed no adverse effects from his medications.
There are no further records from this physician.

At that time, apparently the claimant requested Dr.
Zurkowski to complete a form setting out mental
limitations of function.  He endorsed a number of
marked and moderate limitations related to work
activity and noted at the bottom of the form that the
claimant "has been markedly 'disunited' in his work."
This statement and the marked and moderate limitations
of function are not supported by the physician's own
patient treatment notes.  They are inconsistent with
his sustained Global Assessment of functioning of 75,
indicating only very mild limitations of functioning.
Further, they are not supported by the other evidence
of record.  Dr. Zurkowski diagnosed bipolar disorder, a
diagnosis not confirmed by any other treating or
examining physician.  Even he questioned this diagnosis
during his treatment.  Further, he treated the claimant
for depression, not bipolar disorder.  A check mark
form rating severity as "moderate" or "marked" is an
unsatisfactory way of evidencing claimant's functional
capacity.  The terms are not defined and have no
intrinsic meaning that would suggest whether they might
be beyond a typical employer's tolerance, or an average
worker's ability.  There is no space in the form for
any explanation of the rationale or basis for any of
the check mark choices.  This is critical when the
doctor's progress notes are not explanatory.

The claimant has been prescribed anti-depressant
medications.  According to the claimant, some of these
have worked well to improve his depression without
significant side effects, despite his continued abuse
of alcohol.  However, there appears to be a pattern
where he ceases the medication and begins to complain
of symptoms of depression again.

(Tr. at 18-19).

The March 12, 2004, Medical Source Statement Mental

which is the subject of plaintiff's argument contained the

55

following findings by Dr. Zurkowski:

He found that plaintiff was moderately limited in the following:

- The ability to understand and remember very short and simple instructions

- The ability to sustain an ordinary routine without special supervision

- The ability to ask simple questions or request assistance

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

He found that plaintiff was markedly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

56

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to set realistic goals or make plans independently of others

According to the form, this assessment was based on plaintiff having bipolar mood disorder.

The ALJ adequately reviewed the medical records of Dr. Zurkowski and found that they do not support these findings of mental limitation. I agree.

On April 11, 2003, plaintiff was oriented times four; his affect was appropriate; his mood was joyful, not manic or depressed; plaintiff's thought processes were goal-directed; his thought content was non-delusional. There is no indication that medication was prescribed or that

plaintiff received any counseling. Rather, the doctor wrote, "need to develop a hobby".

The following month on May 10, 2003, plaintiff's grooming and hygiene were good, his affect was appropriate, thought content was non-delusional, memory and attention were adequate. Dr. Zurkowski assessed bipolar mood disorder and depression, although plaintiff's GAF was 75 meaning if symptoms are present, they are transient and expectable reactions to psychosocial stressors. Bipolar mood disorder is an affective disorder characterized by the occurrence of alternating periods of euphoria (mania) and depression.[4] Dr. Zurkowski at no time noted any symptoms of mania or any claims of symptoms of mania. He prescribed Prozac, which is used to treat depression, and he also prescribed Wellbutrin to help plaintiff stop smoking.

On August 9, 2003, plaintiff's grooming and hygiene were good, his affect was appropriate, articulation was good, thought content was non-delusional, memory was adequate, attention and concentration were good, insight was fair, judgment was fair. Although Dr. Zurkowski again diagnosed bipolar mood disorder, he wrote, "I'm questioning

---

[4]Steadman's Medical Dictionary.

58

its presence." Dr. Zurkowski stopped plaintiff's Prozac, apparently at plaintiff's request although he had been experiencing no adverse side effects from that medication. He continued plaintiff on Wellbutrin and added Trazodone, an antidepressant.

On September 27, 2003, plaintiff was oriented times four, his grooming and hygiene were fair, his affect was appropriate. Dr. Zurkowski wrote, "rule out bipolar mood disorder, major depression". Despite this diagnosis, plaintiff's GAF was 75, meaning if symptoms are present, they are transient and expectable reactions to psychosocial stressors. Plaintiff's medications were continued unchanged.

On December 6, 2003, plaintiff was oriented times four, his grooming and hygiene were good, his affect was appropriate, his articulation was good. Because plaintiff complained of social phobia, Dr. Zurkowski found that plaintiff's thought content was delusional. This time, Dr. Zurkowski assessed only depression, not bipolar mood disorder.

On January 3, 2004, plaintiff was oriented times four, his grooming and hygiene were fair, his affect was appropriate, his motor activity was normal, his speech was

59

normal, his thought content was non-delusional, his memory was fair. Dr. Zurkowski assessed depressive disorder, rule out bipolar mood disorder. Plaintiff's GAF was 75, meaning if symptoms are present, they are transient and expectable reactions to psychosocial stressors. Dr. Zurkowski checked "none" where the form says, "Meds prescribed".

A little over two months later, on March 12, 2004, plaintiff saw Dr. Zurkowski who found plaintiff's grooming and hygiene good, his affect appropriate, his motor activity normal. He checked "nondelusional" thought content, then crossed that out and checked "delusional"; however, there is nothing in the record to suggest delusional thoughts. Plaintiff's GAF was 75, meaning if symptoms are present, they are transient and expectable reactions to psychosocial stressors. Dr. Zurkowski assessed bipolar mood disorder, rule out obsessive compulsive disorder, and social phobia. He then commenced filling out the Medical Source Statement Mental which listed extreme mental limitations.

There simply is no support in Dr. Zurkowski's records for the limitations listed in the Medical Source Statement. Dr. Zurkowski found that plaintiff was "markedly limited" in his ability to remember locations and work-like procedures and his ability to remember detailed instructions. He found

60

that plaintiff was "moderately limited" in his ability to remember very short and simple instructions. Yet, in his own medical records, Dr. Zurkowski found that plaintiff's immediate memory, recent memory, intermediate memory, and remote memory either good or fair on every single visit.

In his Medical Source Statement, Dr. Zurkowski found that plaintiff's ability to maintain attention and concentration for extended periods was "markedly limited." However, Dr. Zurkowski found plaintiff's attention fair on May 10, 2003, and good on August 9, 2003, and he found plaintiff's concentration good on August 9, 2003. The only time he found plaintiff's attention and concentration poor was on January 3, 2004, when he also found that plaintiff had slurred speech. Interestingly, Dr. Zurkowski, in the Medical Source Statement, commented that plaintiff had no alcohol abuse or addiction history. Plaintiff's slurred speech, on the only occasion that Dr. Zurkowski found his concentration and attention poor, along with Dr. Zurkowski's apparently being unaware of plaintiff's alcoholism and continued use of alcohol, detract from his finding on this occasion that plaintiff's concentration and attention were poor. In any event, a finding on one occasion out of a year that plaintiff's attention and concentration were poor does

not support Dr. Zurkowski's finding that plaintiff's ability to maintain attention and concentration is "markedly limited."

Dr. Zurkowski found that plaintiff is "markedly limited" in his ability to perform activities within a schedule, maintain regular attendance, and be punctual. There is no indication anywhere in any of Dr. Zurkowski's records or any other doctor's records that plaintiff ever missed an appointment or was late for an appointment. There is simply no evidence that plaintiff is limited at all in his ability to perform activities within a schedule, maintain regular attendance or be punctual.

Dr. Zurkowski found that plaintiff is "markedly limited" in his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. Yet, during every single office visit, Dr. Zurkowski found that plaintiff's grooming and hygiene were good. There is simply no basis for his finding of marked limitation in this area.

In addition to Dr. Zurkowski's findings being completely unsupported by his own medical records, those findings are unsupported by anything else in the record. On February 20, 2003, Dr. Lutz found that plaintiff was able to

62

stay focused while performing specific tasks, such as on the Mental Status items. On March 11, 2003, Dr. Sutton found that plaintiff was not significantly limited in his ability to maintain attention and concentration. On September 23, 2003, plaintiff was seen at Missouri Ozarks Community Health where he said he was feeling better and his depression was noted as being in a steady state. On October 9, 2003, Dr. Clarke noted that although plaintiff said he had suffered from depression throughout his life, he did not seem particularly depressed that day.

Because Dr. Zurkowski's records do not support the restrictions listed in his Medical Source Statement, and because those limitations are contradicted by all of the other evidence in the record, I find that the ALJ did not err in failing to give controlling weight to the opinions in that Medical Source Statement.

### VII. TESTIMONY OF VOCATIONAL EXPERT

Next plaintiff argues that the ALJ erred in "ignoring the testimony of the vocational expert". Plaintiff's argument is actually an extension of his previous argument, i.e., the ALJ should have given controlling weight to the opinions of Dr. Ball and Dr. Zurkowski, and the vocational expert testified that a person with those limitations could

63

perform no work.

Because I find that the ALJ did not err in failing to give controlling weight to the opinions of Dr. Ball and Dr. Zurkowski, I also find that the ALJ did not err in failing to find that plaintiff could perform no work based on those opinions.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision to find plaintiff not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
April 11, 2006

64